IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN RE: ) | |
| ) | |
| DEBRA LYNNE HOPKINS, ) | Case No. 11-44130-13-abf |
| ) | |
| Debtor. ) | |
| ) | |
| BELFOR USA GROUP, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adversary No. 11-4337-13-abf |
| ) | |
| DEBRA LYNNE HOPKINS, ) | |
| ) | |
| Defendant. ) | |

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW ON
NONDISCHARGEABILITY UNDER 11 § U.S.C. 523
AND
ORDER DIRECTING FURTHER EVIDENCE ON REASONABLENESS
OF ATTORNEYS' FEES</u>**

Plaintiff/Creditor Belfor USA Group, Inc. ("Belfor") seeks a determination of nondischargeability, pursuant to 11 U.S.C. §§ 523(a)(4) and (a)(6), against Debtor Debra Lynne Hopkins for a debt owed to it for services rendered. For the reasons announced at the conclusion of the trial, as supplemented by those that follow, I find that Belfor is entitled to a nondischargeable judgment against Hopkins in the amount of $37,676.33 plus interest, costs, and reasonable attorneys' fees in an amount proportional to the nondischargeable portion of the debt.

FACTUAL BACKGROUND

On October 23, 2006, Hopkins' home was damaged by fire. At the time of the fire, the house was insured by American Family Insurance Group and was subject to a Deed of Trust held by Wells Fargo Bank, N.A. On October 25, 2006, Hopkins entered into a contract (the "Work Authorization") with Belfor whereby Belfor agreed to repair the fire damage to Hopkins' house. Pursuant to the Work Authorization and insurance policy, on June 25, 2007, Belfor submitted an invoice to the general adjusters at American Family to repair the damage to the house. In addition to a separate cleaning invoice not at issue here, the invoice for the repairs to the house was $104,949.14.

Out of that amount, American Family had previously sent a check in the amount of $6,727.28 to the City of Lee's Summit, Missouri, representing a deposit to the city under a debris removal ordinance. On May 23, 2007, the City sent a check for $6,852.42 (the "Emergency Services Check") to Hopkins because Belfor had completed the debris removal required under the ordinance.[1] Hopkins presented un-rebutted testimony that she received a phone call from a City employee instructing her

---

[1] No evidence was presented to explain the difference in the value of these two checks. Perhaps the increased amount represents interest accrued while the City held the checks.

that the $6,852.42 was hers. Hopkins deposited the check into her personal account at North American Savings Bank and spent it.

In January 2008, Hopkins signed a Certificate of Completion, acknowledging that Belfor had completed its work on the house. She also signed a document directing Wells Fargo to pay Belfor directly for its work.[2] On February 21, 2008, and March 13, 2008, Wells Fargo sent checks for $20,098.51 and $40,197.02, respectively, made jointly payable to Hopkins and Belfor, to Hopkins. These two checks totaled $60,395.53. Hopkins promptly endorsed each of those checks and gave them to Belfor's representative, Michael Montgomery.

On April 30, 2008, American Family issued a fourth check (the "April 30 Check") made payable to Hopkins, Wells Fargo, and Belfor in the amount of $37,676.33, representing the total amount of the invoice, less Hopkins' $250 deductible. Hopkins endorsed this check and gave it to Belfor. On about May 13, 2008, Belfor endorsed the check and mailed it to Wells Fargo for it to endorse. Wells Fargo endorsed the check and mailed it back to Hopkins. Hopkins testified that she placed the fully-endorsed check into a fire-proof safe in her home for a couple of months. On December 26, 2008, Hopkins deposited the $37,676.33 into her personal

---

[2] Apparently, American Family had submitted part of the insurance proceeds to Wells Fargo, who was holding the money to be disbursed to Belfor.

bank account. Hopkins testified that she used these funds to cure the arrearage on her mortgage payments in an attempt to keep her home and for other expenses. To this date, Belfor has never received any of the funds from the April 30 Check nor the Emergency Services Check. Belfor asserts that Hopkins owes it $44,653.61.[3]

On August 31, 2011, Hopkins filed for Chapter 13 bankruptcy protection and on November 18, 2011, Belfor filed this adversary proceeding seeking a determination that the money owed to Belfor, including attorneys' fees, costs, interest and punitive damages, be declared nondischargeable.

For the following reasons, I find that the debt from the Emergency Services Check is dischargeable but the funds from the April 30 Check are nondischargeable under both 11 U.S.C. §§ 523(a)(4) and (a)(6).

## 11 U.S.C. § 523(a)(4)

As relevant here, § 523(a)(4) of the Bankruptcy Code provides that a discharge under § 727 or § 1328(b) "does not discharge an individual debtor from any debt . . . for . . . embezzlement."[4] "Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has

---

[3] This total represents the amount paid to the City ($6,727.28), plus the April 30 Check ($37,676.33), plus Hopkins' $250 deductible.

[4] 11 U.S.C. § 523(a)(4).

4

lawfully come."[5] To show that Hopkins' conduct amounted to embezzlement under § 523(a)(4), Belfor must prove, by a preponderance of the evidence:[6] (1) an appropriation of funds for Hopkins own benefit by fraudulent intent or deceit; (2) the deposit of the resulting funds in an account accessible only to Hopkins; and (3) the disbursal or use of those funds without explanation of reason or purpose.[7]

Based on Hopkins' unrefuted testimony that a City employee told her that the money from the Emergency Services Check belonged to her, I find that Belfor failed to prove, by a preponderance of the evidence, that Hopkins deposited that check with fraudulent intent. The debt of $6,852.42 is, therefore, dischargeable.

In contrast, Hopkins testified that she knew that the April 30 Check belonged to Belfor. Consistent with that understanding, Hopkins had correctly endorsed and turned over to Belfor the two prior checks she had received earlier in 2008. Based on Hopkins' testimony, and her correct handling of the February and March checks, I find that Hopkins understood that the purpose of the checks coming from American Family and Wells Fargo was to pay Belfor for services rendered. When Hopkins

---

[5] *In re Treadwell*, 459 B.R. 394, 406 (Bankr. W.D. Mo. 2011) (citing 4 Collier on Bankruptcy ¶ 523.10[2] (15th ed. rev.)). *See also Doran Services, Inc. v. Valentine (In re Valentine)*, 104 B.R. 67, 71 (Bankr. S.D. Ind. 1988).

[6] *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

[7] *In re Treadwell*, 459 B.R. at 406 (citing 4 Collier on Bankruptcy ¶ 523.10[2] (15th ed. rev.)).

5

deposited the April 30 Check into her personal bank account – an account accessible only to her – and spent the money, she did so for her own benefit and, I find, she did so with fraudulent intent. Her explanation of her reason for doing so – that she simply needed the money for her own use – was not sufficient. I therefore find that Belfor proved Hopkins' actions meet the elements of embezzlement under § 523(a)(4) and, as a result, the debt of $37,676.33 is nondischargeable.[8]

### 11 U.S.C. § 523(A)(6)

Section 523(a)(6) of the Bankruptcy Code excepts from a debtor's discharge, any debt for "willful and malicious injury by the debtor to another entity."[9] Willful and malicious are two distinct requirements that Belfor, as the party seeking to avoid the discharge of the debt, must prove by a preponderance of the evidence.[10] Willfulness is defined as headstrong and knowing conduct, and malicious is defined as conduct targeted at the creditor at least in the sense that the conduct is certain or

---

[8] *Accord In re Valentine*, 104 B.R. 67, 71 (Bankr. S.D. Ind. 1988) (holding that debtor's signing of the co-payee's name on insurance proceeds check and depositing the check into his own account, with intentional and knowing disregard for the co-payee's rights to the funds, was nondischargeable as embezzlement under § 523(a)(4)).

[9] 11 U.S.C. § 523(a)(6).

[10] *In re Scarborough*, 171 F.3d 638, 641 (8th Cir.1999) (citations omitted).

almost certain to cause harm.[11] Hopkins must have acted with the intent to harm Belfor rather than merely acting intentionally in a way that resulted in harm.[12]

I find that Hopkins intentionally deposited the proceeds from the April 30 Check into her personal account with the full knowledge that the money belonged to Belfor and with the full understanding that, by withholding the payment, Belfor would not be paid for its services and would be harmed as a result. I find, therefore, that Hopkins' actions with regard to the April 30 check constitute willful and malicious injury to Belfor. Consequently, the part of the debt represented by that check is nondischargeable under § 523(a)(6).

## PUNITIVE DAMAGES

"Punitive damages may be awarded if the evidence and the inferences drawn therefrom are sufficient to permit a reasonable trier of fact to conclude that the plaintiff established with convincing clarity – that is, that it was highly probable – that the defendant's conduct was outrageous because of evil motive or reckless indifference."[13] As relevant here, factors the Court should consider include the

---

[11] *Id.*

[12] *Id.*; *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998).

[13] *Cutcliff v. Reuter (In re Reuter)*, 427 B.R. 727, 767 (Bankr. W.D. Mo. 2010) (citation and internal quotation marks and modifications omitted).

degree of malice, the character and financial worth of each party, the injury suffered, and all circumstances surrounding the bad act, including mitigating and aggravating circumstances.[14]

Hopkins testified that she spent the money, at least in part, to save her home. Although I found above that Hopkins' spending the money was malicious under § 523(a)(6) in that she did so with the knowledge that her conduct was certain or almost certain to cause Belfor harm, I do not find that her conduct was so outrageous as to warrant punitive damages. In addition, Belfor could have prevented the harm by waiting to endorse the check until after Wells Fargo and Hopkins had done so. Belfor also waited several months after the check went missing to pursue its whereabouts. Finally, the relative character, sophistication, and financial worth of the two parties do not warrant punitive damages. Based on all that, I find that punitive damages are not warranted here.

## INTEREST, COSTS, AND ATTORNEYS' FEES

Belfor also asserts that its interest, costs, and attorneys' fees should be included in the nondischargeable judgment.

---

[14] *Id.*

The Supreme Court has held that a nondischargeable judgment in a fraud action is not limited solely to the value of the money the debtor obtained by fraud.[15] The Supreme Court paid particular attention to the language of § 523 of the Bankruptcy Code and found that the "debt for" language means "debt as a result of" or "debt arising from."[16] When read in the context of the statute as a whole, §§ 523(a)(4) and (a)(6) excepts from discharge *any* liability that arises from a debtor's fraudulent acquisition of money.[17] As part of the "debt for" Hopkins' embezzlement and willful and malicious injury, the contractual interest and costs accumulating from Hopkins' taking of the $37,676.33 are liabilities due to Belfor and will, therefore, be nondischargeable.

With regard to attorneys' fees, under the "American Rule," parties to litigation generally bear the cost of their own attorney's fees absent a statute or contract stating otherwise.[18] The Work Authorization clearly provides for attorneys' fees:

"If for any reason the amount due under this Work Authorization is not paid when due, [Belfor] shall be entitled to [its] expenses and attorneys

---

[15] *Cohen v. De La Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998).

[16] *Id.*, 523 U.S. at 221 (interpreting § 523(a)(2)(A) as prohibiting "the discharge of any liability arising from a debtors fraudulent acquisition of money, property, etc., including an award of treble damages for the fraud.").

[17] *Id.* at 221 (emphasis added).

[18] *See Seimer v. Nangle*, 281 B.R. 654, 657 (B.A.P. 8th Cir. 2002).

9

fees incurred in the collection of this agreement with interest on the unpaid balance at the rate of 1.5% per month or the rate prescribed by law."

Belfor's claim in this case would, therefore, include such attorneys' fees. Moreover, fees provided by contract can be included as part of a nondischargeable debt.[19] While I recognize that some courts have held that attorneys' fees based on contract are dischargeable when the court finds that the underlying debt is nondischargeable under § 523(a),[20] in the Eighth Circuit, it makes no difference whether the debt itself was legally or fraudulently incurred.[21] In other words, if the underlying debt is nondischargeable, and the contract provides for attorneys' fees, those fees are likewise nondischargeable.[22]

And, when a portion of the debt is nondischargeable, courts have held that attorneys' fees are nondischargeable in the same proportion as the compensatory

---

[19] *Merchants Nat'l Bank Winona v. Moen (In re Moen)*, 238 B.R. 785, 795 (B.A.P. 8th Cir. 1999) (citing *In re Alport*, 144 F.3d 1163, 1168 (8th Cir. 1998); *In re Hunter*, 771 F.2d 1126, 1131 (8th Cir. 1985)).

[20] *See, e.g., First State Bank of Alsip v. Iaquinta (In re Iaquinta)*, 98 B.R. 919, 927 (Bankr. N.D. Ill. 1989) (holding that the creditor's § 523(a)(6) action sounded in tort rather than arising solely from the underlying contract, thus attorney fee provisions in security agreements were not controlling); *In re Mills*, 111 B.R. 186, 207 (Bankr. N.D. Ind. 1988) (holding that damages in action sounding in tort for conversion of creditor's collateral do not include attorney's fees provided in the agreement between the parties).

[21] *In re Moen*, 238 B.R. at 795.

[22] *Id.*

damages are held to be nondischargeable.[23] Here, of the $44,653.61 claim asserted by Belfor, $37,676.33 (or 84%) is nondischargeable. As a result, 84% of Belfor's reasonable attorneys' fees will be nondischargeable.

Belfor has provided the Court with a copy of a Fee Agreement that was executed between it and its attorneys. That Fee Agreement provides that Belfor's attorneys shall be paid 40% of the gross amount of all sums recovered after the commencement of the trial. However, no evidence pertaining to the reasonableness of such fees has been provided to the Court.

ACCORDINGLY, Belfor is directed to submit evidence and argument pertaining to the reasonableness of its attorneys' fees within 14 days of the date of this Order. If Hopkins wishes to object to such evidence and argument, she shall have 14 days in which to respond. After the Court makes a determination as to a reasonable amount of attorneys' fees to which Belfor is entitled, the Clerk will be directed to enter a nondischargeable judgment against Hopkins in the amount of $37,676.33 plus

---

[23] *See Community Bank of the Ozarks v. Uptegrove* (*In re Uptegrove*), 2010 WL 2545786 (Bankr. W.D. Mo. June 18, 2010); *Integrated Practice Mgmt Inc. v. Olson* (*In re Olson*), 325 B.R. 791, 802 (Bankr. N.D. Iowa 2005). *See also In re Hunter*, 771 F.2d 1126, 1131 (8th Cir. 1985) (holding that the plaintiff may be entitled to recover attorneys' fees ancillary to the portion of the debt that was nondischargeable, "or those charges may be subject to apportionment between the dischargeable and nondischargeable parts of the underlying indebtedness.").

interest on that amount, costs, and 84% of the amount of attorneys' fees determined to be reasonable.

    IT IS SO ORDERED.

                                            /s/ Arthur B. Federman
                                            Honorable Arthur B. Federman
                                            United States Bankruptcy Judge

Date: 3/12/12